Filed 2/24/26  In re L.V. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.V., A Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>L.V.,<br><br>        Defendant and Appellant. | E086611<br><br>(Super.Ct.No. DLRI2200013)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Mark Petersen, Judge.

Affirmed.

Costen Ruiz Law; and Jesse Ruiz for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General,

Arlene A. Sevidal, Robin Urbanski and Anastasia Sagorsky, Deputy Attorneys General,

for Plaintiff and Respondent.

1

# I.

## INTRODUCTION

This appeal concerns a juvenile court transfer hearing under subdivision (a) of Welfare and Institutions Code section 707.[1] About two weeks before his 17th birthday, defendant and appellant L.V. (L.V.), robbed a high school friend for his cash and put a handgun directly to his head and fired. The gun malfunctioned. L.V. cleared the jam and fired at his friend as he fled, striking him in the shoulder. A juvenile wardship petition (§ 602) was filed charging L.V. with attempted first degree murder (Pen. Code, §§ 664/187, subd. (a)), robbery (Pen. Code, § 211), and assault with a semiautomatic firearm attempted murder (Pen. Code, § 245, subd. (b)), along with firearm and great bodily injury enhancements. The juvenile court granted the People's motion to transfer the matter from juvenile court to a court of criminal jurisdiction (adult criminal court). L.V. appealed, contending there was insufficient evidence to support the juvenile court's order transferring the matter to adult criminal court. We find substantial evidence supports the juvenile court's findings and affirm the order.

---

[1] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Current Wardship Petition[2]*

On August 17, 2024, at around 5:50 p.m., L.V. robbed and shot M.G., a "close friend" of about three years that he knew from high school. M.G. informed Riverside Police Department detectives that L.V. had invited M.G. over so they could smoke. M.G. then went to L.V.'s house in Riverside. The two had been hanging out together every day for the past two or three weeks.

While smoking marijuana at L.V.'s home, L.V. showed M.G. two handguns and said he had robbed someone for one of them. M.G. recognized one of the guns as one that L.V. normally carried. L.V. asked M.G. if he was carrying a gun, and M.G. said he was, in the Louis Vuitton crossbody bag he had with him. M.G. claimed that this was not true, but M.G. said it because he wanted to get out of there and wanted to leave. M.G. had been told that L.V. was no longer "gang banging," but once he saw the handguns, he believed this was false and that L.V. was still involved in gang life. According to M.G., L.V. had a Riverside bell tattooed on his hand and was possibly a member of a street gang known as " 'Wyld Life.' "

M.G. eventually said he was leaving. L.V. insisted on walking him home as L.V. had in the past, despite M.G. stating he did not want him to walk him home. M.G. had also felt in the past that L.V. had been trying to "set him up," for instance by walking in

---

[2] The factual background is taken from the probation and police reports.

the opposite direction of their stated destination. When they left L.V.'s house, L.V. carried the two handguns in his pockets.

As they walked towards M.G.'s home, M.G.'s iPhone fell out of his crossbody bag, and L.V. started confronting him about the fact that he did not have a handgun as he had claimed. L.V. put a gun to M.G.'s head, making direct contact, and removed his crossbody bag, which contained $600 in cash. L.V. pulled the trigger, and M.G. heard a click, indicating the gun had malfunctioned. L.V. said, " 'You know me and the Edgemont Homies.' " M.G. told L.V. he was going to tell L.V.'s mother about this. L.V. responded that they were not friends, and he was going to " 'smoke' " him. M.G. headed off, and L.V. started firing on him, shooting two or three times. M.G. ran towards a park but fell. At that point, people started helping him.

A witness who wished to remain anonymous told officers he was outside his home around 5:45 p.m. when he saw two males, one Caucasian and one African American, arguing on the street. The white male was holding a black handgun, and shortly thereafter, he heard two loud noises. About five minutes later, he saw two bullet casings in the street. Another witness reported hearing two "fireworks" go off. He then looked out his front door and saw a tall thin blonde male wearing all dark clothes running past.

Officers reviewed surveillance video footage captured by a Ring camera on a nearby garage. The video showed a black male walking calmly with a white male dressed in dark clothes at 5:38 p.m. At 5:42 p.m., the footage showed the two running in opposite directions on Dwight Avenue. An additional witness saw M.G. running towards

4

her, bleeding from his back and right shoulder. Detectives at the hospital observed that M.G.'s right shoulder was bandaged. The injury was through from where the bullet struck him in the back of his shoulder to where it exited in the front. Officers at the scene noted that M.G.'s jacket had entry and exit holes on its right shoulder and found two .40 caliber casings on Dwight Avenue between Linden and Minnesota Streets.

On August 19, 2024, a section 602 was filed charging L.V. with attempted first degree murder (Pen. Code, §§ 664/187, subd. (a); count 1), robbery (Pen. Code, § 211; count 2), assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b); count 3). As to counts 1 and 2, it was alleged that L.V. personally and intentionally discharged a firearm causing great bodily injury (Pen. Code, § 12022.53, subd. (d)). As to count 3, it was alleged that L.V. personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)) and that he personally used a firearm (Pen. Code, § 12022.5, subd. (a)).

B. *L.V.'s Criminal History and Conduct in Juvenile Hall*

On July 29, 2022, when L.V. was 14 years old, police observed him and two others in a vehicle that was emitting smoke and a strong odor of marijuana. The car contained a nitrous oxide tank, and deflated balloons were scattered throughout the vehicle. Officers found a black backpack in the car which contained a handgun with an unloaded 15-round magazine, a plastic bag containing over 260 grams of marijuana, and a black wallet decorated with anime characters. All of the vehicle's occupants denied ownership of the backpack. The gun had been reported stolen out of Riverside exactly one week earlier. Officers spoke with each of the vehicle's occupants individually, and one of them said the

backpack belonged to L.V.  Police later spoke with L.V.'s mother, J.V., who confirmed that he carried a black backpack and had a black anime wallet.

On August 1, 2022, an initial petition was filed alleging L.V. possessed a loaded firearm in a vehicle (Pen. Code, § 25850, subd. (c)(2)) and that he was a minor in possession of a firearm (Pen. Code, § 29610).

On September 6, 2022, L.V. admitted the possession of a firearm charge and was placed on informal probation (§ 725, subd. (a)) under various terms and conditions.

On November 20, 2022, L.V. visited his grandfather and had taken a nap in his room.  Almost a week later, the grandfather went to clean his gun and discovered it was missing from his room.  L.V. and his mother had been the grandfather's only recent visitors.  When the grandfather contacted L.V.'s mother, she admitted L.V. had taken the firearm.  L.V. did not report this incident to his probation officer.

On December 8, 2022, L.V. was arrested for felony grand theft of a firearm (Pen. Code, § 487, subd. (d)(2)).

On December 19, 2022, the People filed a petition to revoke L.V.'s probation on the following grounds:  18 unexcused absences from school, positive drug test results for marijuana, and the new arrest for allegedly stealing his grandfather's gun.

On March 6, 2023, L.V.'s grant of informal probation was terminated as "unsuccessful."

On January 11, 2024, L.V., accompanied by three others, grabbed several cell phones from a T-Mobile store in West Covina, then fled in a vehicle.  Police officers

6

pursued the vehicle on the freeway at speeds over 100 miles per hour until the car exited the freeway and stopped after running out of gas. The occupants fled on foot, and L.V. was detained.

On March 6, 2024, a petition was filed in Los Angeles County alleging L.V. committed one count of felony organized retail theft (Pen. Code, § 490.4, subd. (a)).

On April 16, 2024, L.V. admitted the allegation. The matter was transferred to Riverside County on May 1, 2024. On that date, L.V. was declared a ward of the court and placed on formal probation with various terms and conditions.

On the evening of May 18, 2024, police responded to a home in the city of Riverside which appeared to have been extensively ransacked. The items stolen were watches, jewelry, firearms, and other items worth over $150,000. Police obtained Instagram records for a Wyld Lyfe gang member named "Big Ace," which revealed a group chat with other Wyld Lyfe members. The chat contained videos of a gun and Louis Vuitton wallet that the homeowners identified as their property stolen during the burglary. "Big Ace" wrote in the chat that "[he] and hh jusk smack a mansion." L.V.'s monikers included "Hot Head" and "Baby Madass." L.V. sent a photo of the wallet to the chat and offered it for sale, boasted about getting away with $10,000, and referred to himself as a "flocker," meaning a burglar. Police officers searched L.V.'s residence and located a Louis Vuitton purse and wallet in his closet that the homeowners identified as their stolen property.

The alleged current shooting incident occurred about three months later on August 17, 2024, while L.V. was still on formal probation.

On January 8, 2025, a new petition was filed alleging that on May 16, 2024, L.V. committed burglary of an inhabited dwelling (Pen. Code, § 459). Three additional counts alleged felony grand theft of various firearms (Pen. Code, § 487, subd. (d)(2)), namely a Amadeo Rossi .357 revolver and two 12-gauge shotguns. The petition also alleged that L.V. had committed the offenses for the benefit of the Wyld Life Society street gang (Pen. Code, § 186.22, subd. (b)(1)(B)), and as to the theft counts, the petition alleged the stolen items were grand thefts involving firearms (Pen. Code, § 1192.7, subd. (c)(26)).

During his detention in juvenile hall, which had begun on August 20, 2024, L.V. had been involved in four physical fights with other minors. In two of those incidents, he had been determined to have been the aggressor, while in another he was determined not the aggressor, and in another, the altercation was deemed mutual combat.

C. *The Transfer Hearing*

On the same day the current petition was filed, August 19, 2024, the People filed a motion to transfer L.V.'s case to a court of criminal jurisdiction (§ 707, subd. (a)(1)).

On June 9, 2025, the juvenile court held a contested transfer hearing. The juvenile court took judicial notice of L.V.'s entire juvenile court case file and had read and considered the probation officer's report filed October 17, 2024, and the briefs filed by both parties. In addition, the court heard testimony from L.V.'s supervising probation

8

officer, Probation Officer O.E., who wrote both the probation report and a Memorandum to the Juvenile Court filed on February 10, 2025.

O.E. opined L.V. should remain in juvenile court. His opinion remained unchanged from the time he wrote the report filed in October 2024 to when he authored the memorandum filed in February 2025. O.E. explained initial factor for transferring a minor to a court of criminal jurisdiction under section 707, subdivision (a), which is the degree of criminal sophistication demonstrated by the attempted murder incident. O.E. concluded that this factor weighed in favor of transfer of the matter to criminal court. The second factor, whether L.V. could be rehabilitated before juvenile court jurisdiction expired, weighed against transfer, according to O.E. He based this opinion on the fact that during L.V.'s "short period of time in regards to wardship as of recent," his "overall performance was good," and "[a]side from those four physical altercations," his behavior in juvenile hall was satisfactory. He further opined that since L.V. was "on task" in completing the obligations assigned by the court and "doing well in other areas of his life," these points weighed against transfer.

O.E.'s opinion did not change despite the fact L.V. was placed on probation on May 1, 2024, and ordered to obey all laws as a term of his probation, yet he committed the residential burglary offense 15 days later on May 16, 2024, the attempted murder occurred during his probationary period, L.V. violated other terms of his probation by associating with disapproved persons, testing positive for marijuana, possessing firearms, and associating with those who possessed them, and all during the first three months of

9

his wardship. O.E.'s opinion was also not changed by L.V.'s performance during his prior grant of probation, which had been terminated as unsuccessful due to excessive school absences, testing positive for marijuana, and the theft of a firearm.

As to the third factor, L.V.'s prior delinquency history, O.E. opined that this factor also weighed against transfer. According to O.E., despite a "pattern of possession of firearms," his apparent ease in obtaining guns, and "escalation" between his first offense and that of the most recent petitions, the "short" nine-month period of overall wardship and the fact that the shooting was his first known violent offense were mitigating factors. As to the fourth factor, the success of previous attempts by the juvenile court to rehabilitate L.V., O.E. opined that this factor also weighed against transfer. He based this on the fact that L.V. had enrolled in a victim awareness class, tested negative for drugs, and completed some community service hours, which were mitigating factors he deemed not outweighed by the aggravating factor of L.V.'s current offenses. As to the final factor, the circumstances and gravity of the offense, O.E. opined that this factor weighed in favor of transfer to a court of criminal jurisdiction. In sum, based on consideration of all the factors, O.E. concluded L.V. should remain in juvenile court.

The juvenile court thereafter heard arguments by both parties. After taking the matter under submission, the court issued its written ruling on July 14, 2025, granting the motion to transfer L.V. to a court of criminal jurisdiction. The court had "considered the evidence presented by counsel, including the probation officer's reports filed October 17, 2024, and February 10, 2025, briefs filed by both parties, People's Exhibit # 1, as well as

10

oral argument by both counsel," plus the petition and other documentation as the court had previously noted at the hearing and the testimony of O.E. The court noted that L.V. was "just over 16 years and 11 months of age at the time of the offense" and that the offenses alleged were listed in section 707, subdivision (b). The court found the People had shown by clear and convincing evidence that L.V. should be transferred to criminal court, based on the totality of the circumstances, and upon evaluation of the five factors detailed in section 707, subdivision (a)(3), criteria (A) through (E). The court noted that the statute required the court to find by clear and convincing evidence that the minor was not amenable to rehabilitation while under the juvenile court's jurisdiction, and then analyzed each of the five factors. L.V. thereafter timely appealed.

III.

DISCUSSION

L.V. contends the juvenile court erred in transferring the matter to adult criminal court because there was insufficient evidence to support any of the five factors the juvenile court must consider to transfer a minor to adult criminal court under section 707, subdivision (a). He believes that because his probation officer opined that he should remain under juvenile jurisdiction, and since the juvenile court did not agree, it disregarded the law and its transfer order therefore must be reversed.

A. *Applicable Law and Standard of Review*

Section 707 sets forth the procedures for transferring an individual who committed a crime as a minor from juvenile court to adult criminal court. "It provides that whenever

a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move 'to transfer the minor from juvenile court to a court of criminal jurisdiction.' " (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164 (*Miguel R.*), citing § 707, subd. (a)(1).) The motion must be made prior to the attachment of jeopardy. After the motion is filed, the probation department prepares "a report on the behavioral patterns and social history of the minor." (§ 707, subd. (a)(1).)

"The Legislature amended section 707 in 2023 and 2024. Effective January 1, 2023, Assembly Bill [No.] 2361 amended section 707[, subdivision] (a)(3) by adding the following italicized language: 'Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction. *In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.* In making its decision, the court shall consider the criteria specified in subparagraphs (A) to (E), inclusive. If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, *which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.*' " (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164; see *In re S.S.* (2023) 89 Cal.App.5th 1277, 1294 (*S.S.*) [explaining that the " 'recite the basis for its decision' " requirement means the juvenile court "should

12

'explicitly "articulate its evaluative process" by detailing "how it weighed the evidence" and by "identify[ing] the specific facts which persuaded the court" to reach its decision' whether to transfer minor to a court of criminal jurisdiction"]; *ibid*. [noting that the juvenile court's articulation of its evaluative process, like its analysis, "should focus on minor's amenability to rehabilitation"].)

Accordingly, Assembly Bill No. 2361 (2021-2022, Reg. Sess.) (Stats. 2022, ch. 330) amended the procedure for transferring a case to adult criminal court in three ways:  (1) it raised the prosecution's burden of proof to clear and convincing evidence, (2) it made amenability to rehabilitation while under jurisdiction of the juvenile court "the ultimate question for the court to decide," and (3) it required the juvenile court to state the reasons supporting a finding that the minor is not amenable to rehabilitation.  (*In re E.P.* (2023) 89 Cal.App.5th 409, 416. (*E.P.*))

The five statutory criteria listed in subparagraphs (A) through (E) of section 707, subdivision (a)(3) were not amended by Assembly Bill No. 2361.  (See Stats. 2022, ch. 330, § 1.)  Those criteria are:  (1) "[t]he degree of criminal sophistication exhibited by the minor"; (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"; (3) "[t]he minor's previous delinquent history"; (4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor"; and (5) "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor."  (§ 707, subd. (a)(3)(A)-(E).)  The statute sets forth a nonexhaustive list of relevant factors for the court to consider with respect to each of the

five criteria.  (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)  These criteria "are based on the premise that the minor did, in fact, commit the offense."  (*People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 682 (*Jones*); *Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 189 (*Kevin P.*).)  The ultimate determination of whether "the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court" (§ 707, subd. (a)(3)) is not the same as the second criterion, which calls for consideration of "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (*id.*, subd. (a)(3)(B)(i)).  (See *Miguel R.*, *supra*, 100 Cal.App.5th at p. 166.)

"Effective January 1, 2024, Senate Bill [No.] 545 [(2023-2024 Reg. Sess.)] amended section 707 to require that with respect to each of th[e] five criteria the juvenile court 'shall give weight to any relevant factor,' including the specific factors listed as relevant to each criterion.  [Citation.]  The previous version of the statute made consideration of those factors discretionary, not mandatory."  (*Miguel R.*, *supra*, 100 Cal.App.5th at pp. 164-165.)  Senate Bill No. 545 further amended section 707 to specify additional factors that must be considered in determining whether the People have carried their burden of proof to transfer a juvenile to adult criminal court.  (See § 707, subd. (a)(3)(A).)  Specifically, Senate Bill No. 545 amended the factors the court must weigh in evaluating a minor's criminal sophistication to include "the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery." (§ 707, subd. (a)(3)(A)(ii).)  It also amended the factors the court must weigh in

14

evaluating the circumstances and gravity of the offense to include "evidence offered that indicates that the person against whom the minor is accused of committing an offense trafficked, sexually abused, or sexually battered the minor." (§ 707, subd. (a)(3)(E)(iii).) The bill's author explained that the 2024 amendments to section 707 " 'will reduce arbitrary determinations surrounding the transfer of juveniles to adult court by establishing that the court's decision to transfer a juvenile must be based on sufficient evidence. Rehabilitation is the way forward, and that includes giving juveniles who have made a mistake the opportunity to create a new future as they prepare to reenter our society as adults.' " (Assem. Off. of Chief Clerk, 3d reading analysis of Assem. Bill No. 2361 (2021-2022 Reg. Sess.) as amended Mar. 31, 2022, p. 1; see *S.S.*, *supra*, 89 Cal.App.5th at pp. 1285-1286.)

The Legislature also recently changed the law as to the length of time a person can remain under the juvenile court's jurisdiction. Previously, the juvenile court retained jurisdiction over a person until they reached age 25, or for a period of two years from the date of their commitment to a secure youth treatment facility, whichever occurred later. (See former § 607, subds. (a)-(c).) Effective September 13, 2023, Senate Bill No. 135 (2023-2024 Reg. Sess.) permits the juvenile court to "retain jurisdiction over a person who is 25 years of age or older for a period not to exceed two years from the date of disposition." (§ 607, subd. (d); see Stats. 2023, ch. 190, § 12.)

"We review the juvenile court's ruling on a transfer motion for abuse of discretion. [Citation.] 'The abuse of discretion standard is not a unified standard; the deference it

15

calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' [Citation.] The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence. [Citation.] In conducting a substantial evidence review, we draw all reasonable inferences in support of the court's findings." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.)

"Likewise, we review for substantial evidence the juvenile court's ultimate finding 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' [Citation.] Because the juvenile court must make that finding by clear and convincing evidence, we 'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165; see *People v. Brown* (2014) 59 Cal.4th 86, 105 [the substantial evidence standard requires the reviewing court to examine the whole record in the light most favorable to the challenged order or judgment to determine whether it discloses evidence that is reasonable, credible and of solid value].)

" 'The standard of proof known as clear and convincing evidence demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt.' [Citations.]

16

' "Clear and convincing" evidence requires a finding of high probability.' [Citations.] Courts have also described the standard 'as requiring that the evidence be " 'so clear as to leave no substantial doubt'; 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " ' " (*S.S.*, *supra*, 89 Cal.App.5th at p. 1286.)

B. *Analysis*

We are unpersuaded by L.V.'s contention that the juvenile court's transfer order is not supported by substantial evidence. As noted, *ante*, in deciding whether transfer was proper, the court was required to evaluate the five criteria set forth in subdivision (a) of section 707. (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 167.) Assembly Bill No. 2361's amendments to section 707 were intended to "refocus" the juvenile court's assessment and require "[t]he analysis of the five criteria set forth in the statute [to] be focused through the lens of amenability to rehabilitation." (*S.S.*, *supra*, 89 Cal.App.5th at p. 1288.) Applying these factors, the ultimate question was whether the People demonstrated, by clear and convincing evidence, that L.V. was "not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3); *Miguel R.*, *supra*, 100 Cal.App.5th at p. 166.) The weight to be given each of the five criteria is within the juvenile court's discretion. (*D.C. v. Superior Court* (2021) 71 Cal.App.5th 441, 445 (*D.C.*); see *E.P.*, *supra*, 89 Cal.App.5th at p. 417 [the court has the discretion to conclude that one or more of the five factors predominate so as to determine the result, even though some or all of the other factors might point to a different result].)

Indeed, in making the "ultimate finding" regarding amenability, the plain language of the statute requires the juvenile court to "consider the criteria specified in subparagraphs (A) to (E), inclusive." (§ 707, subd. (a)(3).) "Thus, according to the statute's plain language, the court is required to consider each of the five listed criteria in determining whether the prosecution has carried its burden of proof to transfer a juvenile to criminal court." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 166.) In other words, the statute unambiguously provides that the evaluation of the five specified criteria is the means by which the juvenile court reaches the ultimate determination of whether the minor is not amenable to rehabilitation; amenability is not itself a separate factual finding that supplants the findings regarding the specified criteria.

Next, we consider whether substantial evidence supports the findings in the juvenile court's transfer order, which was issued after the court heard testimony from a number L.V.'s supervising probation officer, and considered various other materials submitted by the parties and the probation officer. In making this determination, we accept all evidence that supports the successful party and draw all reasonable inferences to uphold the challenged order. (*Harley-Davidson, Inc. v. Franchise Tax Bd.* (2015) 237 Cal.App.4th 193, 213.) "It is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it." (*Ibid*.) In applying the substantial evidence standard, we do not review the evidence to determine if there is substantial evidence to support L.V.'s position, but only to see if substantial evidence exists to

18

support the challenged order. Thus, we only look at the evidence offered in the People's favor and determine if it was sufficient to support the juvenile court's findings as to each of the five statutory criteria. (See *Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245.) If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal for insufficient evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1054.) "As with all substantial evidence challenges, an appellant challenging [a finding of fact] for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry his burden." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266 (*Defend the Bay*).)

Here, the record reflects that the juvenile court evaluated each of the five statutory criteria and, based on that analysis, determined that transfer of the matter to a court of criminal jurisdiction was proper because L.V. would not have been (and currently was not) amenable to rehabilitation while under the jurisdiction of the juvenile court. No further finding regarding amenability was required. To the extent L.V. suggests otherwise, we disagree.

As we next explain, substantial evidence supports the juvenile court's transfer order.

### 1. Criminal Sophistication

The first statutory criterion is "[t]he degree of criminal sophistication exhibited by the minor." (§ 707, subd. (a)(3)(A)(i).) When evaluating this criterion, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication." (*Id.*, subd. (a)(3)(A)(ii).)

The juvenile court "consider[s] the whole picture, that is, all the evidence that might bear on the minor's criminal sophistication, including any criminal sophistication manifested in the present crime." (*Jones*, *supra*, 18 Cal.4th at pp. 683-684; *Kevin P.*, *supra*, 57 Cal.App.5th at p. 192.) Criminal sophistication can be shown with facts demonstrating an " 'ability to appreciate the risks and consequences of [one's] criminal behavior' and [one's] awareness 'of the wrongfulness . . . of [one's] conduct.' " (*Kevin P.*, at p. 193.) Positive factors such as "normal cognitive functioning" or intelligence by itself "do not affirmatively demonstrate criminal sophistication." (*Ibid*.) But they can support finding this criterion "weighs in favor of transfer to the extent [the positive factors] fail to mitigate other evidence that does affirmatively demonstrate criminal

20

sophistication." (*Ibid.*; see *In re J.S.* (2024) 105 Cal.App.5th 205, 214 (*J.S.*) ["There was little to no indication [the minor] suffered from any intellectual deficits. While in custody, [the minor] was able to finish high school and had taken college level courses"].)

Prior to assessing the five factors, the juvenile court noted L.V. was 16 years, 11 months, and 17 days old at the time of the current offenses and that he was "14 days shy of turning 17 years of age." The court further pointed out that L.V. was 17 years, and nine months of age, at the time of the transfer hearing. In assessing the criminal sophistication criterion, the juvenile court explained as follows: "The probation officer stated in his report that the minor's displayed a lack of human compassion and proper decision-making skills. It was noted that the minor would have killed the victim should there not have been an issue with the gun when he initially attempted to fire it. The boldness and severity of the minor's actions and disrespect for the law are viewed as criminally sophisticated by the probation officer. [O.E.] testified he was solid in his opinion that this particular criteria weighed in favor of transfer to adult court. [¶] There was not much cross-examination as to this criteria. The court does note that when the gun misfired on the first attempt, the minor did not give up or cease his activity. The minor took whatever actions were necessary to clear or fix the misfire, and then attempt to shoot the victim again. The minor was successful in getting two shots off—after the misfire—striking the victim one time. This shows the court that the minor was intent on shooting the victim, that this did not represent an accidental shooting, and that the minor had the clear intent of wanting to physically harm the victim." The court agreed with

21

L.V.'s probation officer O.E. and concluded by stating: "Based on all of the above, the court finds the evidence does support a finding that the minor knew what he was doing, participated willingly, had knowledge of the plan and implementation of the plan. The minor certainly knew the victim and took advantage of a position of trust to unknowingly rob the victim, steal his cross-body bag, and then attempt to shoot the victim. The minor made a clear and conscious choice to engage in these actions. The minor's actions did not appear to be impulsive or reactive, rather they were intentional and pre-planned."

L.V. argues there was insufficient evidence to support the juvenile court's finding that he showed criminal sophistication. As support for his position, L.V. claims he was 16 years of age, "an age at which adolescents typically acted with impulsivity, emotional reactivity, and limited appreciation of long-term consequences." He also claims "Nothing in the record showed that L.V. engaged in advance planning or deliberate preparation. The evidence showed a sudden conflict between two teenagers who had been spending time together in the weeks leading up to the incident. This context supported an inference of immature, emotionally driven behavior rather than adult-like strategic thinking."

We are unpersuaded, as L.V. simply cites certain defense evidence in support of his position and based thereon, makes arguments more appropriately directed to a trier of fact than to an appellate court. In a substantial evidence challenge, an appellant cannot carry his burden on appeal by merely rearguing the "facts" and/or reasserting his position at trial. Instead, the appellant must lay out the evidence favorable to the other side and

22

show why it is lacking.  L.V.'s failure to do so here is fatal to his claim.  (*Defend the Bay*, *supra*, 119 Cal.App.4th at p. 1266.)  It is not our role to independently review the record to make up for L.V.'s failure to carry his burden.  (*Ibid*.)

In any event, we have reviewed the record and find that it includes substantial evidence supporting the challenged finding.  L.V. insisted on walking M.G. home against his protests, left the house with two guns in his pockets, at least one of which was loaded, and immediately robbed M.G. upon realizing he was not armed.  Taking M.G.'s money and putting a gun to his head and firing was not a "sudden conflict" between the two but a robbery and attempted murder by someone M.G. considered a friend.  The gun's malfunction did not cause L.V. to reconsider shooting M.G. but instead L.V. coolly overcame the jam and decided to fire at M.G. as he was fleeing.  L.V.'s actions show not just a commitment to killing M.G., but a recommitment to that intent.  (See *J.S.*, *supra*, 105 Cal.App.5th at p. 214 [minor's deliberate violent conduct, which had progressed from robbery to robbery with a knife to murder with a knife, denial of any involvement in the murder, and attempts to conceal evidence reflected criminal sophistication]; *Kevin P.*, *supra*, 57 Cal.App.5th at p. 194 [a minor's attempts to avoid detection, including setting fire to a body and an apartment, "constitute[d] substantial evidence of a certain degree of criminal sophistication"].)  There is no evidence to suggest L.V.'s actions were the result of peer pressure, a stressful situation, or reflexive, as he claims.

In addition, among other things, there was evidence showing that L.V. was attending school, had earned a "B" in Expressive Writing and "C" in English, and there

23

were no issues reported while attending school in juvenile hall. While L.V. had an active Individualized Education Plan dated May 3, 2024, for 290 Specific Learning Disability and 280 Other Health Impairment, L.V. had no physical or mental health issues and there was no evidence that L.V. was a victim of human trafficking, sexual abuse, or sexual battery. L.V. also had no significant maturity issues other than being a typical 16 year-old, and did not act impulsively in connection with the currently charged offenses. Further, there was evidence that L.V.'s criminal behaviors (which included a pattern of gang-related offenses and violence) were deliberate and calculated and of increasing seriousness (or escalation), and that L.V. understood the consequences of his criminal behavior and gang involvement. And, as noted above, the record reflects that the juvenile court considered the relevant factors in determining that the criminal sophistication criterion weighed in favor of transferring the matter to adult criminal court. To the extent L.V. requests that we conduct an independent review of the record and make our own determinations as to the weight of the evidence, he misconstrues and/or misapplies the substantial evidence standard of review and we decline to do so. (*Defend the Bay*, *supra*, 119 Cal.App.4th at p. 1266.)

       2.   Rehabilitation Prior to Expiration of Juvenile Court's Jurisdiction

The second statutory criterion is "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction." (§ 707, subd. (a)(3)(B)(i).) In evaluating this criterion, the court must consider "the minor's potential to grow and mature." (*Id.*, subd. (a)(3)(B)(ii).) The focus "is whether there is enough time to

rehabilitate the minor while the minor is still eligible to remain under juvenile court jurisdiction." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 166.)

The parties may introduce expert testimony specifically addressing "the availability of treatment programs in the juvenile court system and the amenability of the minor to those programs." (*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 721 (*J.N.*).) Expert witnesses can provide "guidance" for the juvenile court in making its determination, and expert opinion testimony "that the minor can be treated by those facilities is entitled to great weight in the court's ultimate determination." (*Jimmy H. v. Superior Court* (1970) 3 Cal.3d 709, 714-715.) However, the "decision rests in the sound discretion of the juvenile court," and an expert opinion that a minor is amenable to treatment "is not conclusive." (*Id.* at p. 715; see *J.S.*, *supra*, 105 Cal.App.5th at p. 212 [juvenile court was not bound by defense expert's testimony and opinion that minor "could be timely rehabilitated"]; *J.N.*, at pp. 721-722 [" 'In those cases where the juvenile court might decide treatment as a juvenile would be in the minor's best interest, the court could still find the minor "unfit if those experts testified that rehabilitation might require treatment beyond the date of his mandatory discharge' "].)

In assessing the rehabilitation criterion, the juvenile court began its analysis by noting "At the time of the alleged offense, the minor was 17. Here, the minor will turn 18 on August 31, 2025—approximately six weeks from the date of this ruling. Jurisdiction of the juvenile court would expire between the age of 23 or 25, based upon the maximum confinement time set at the time of the dispositional hearing. As a result,

the court would lose jurisdiction on either August 31, 2030, August 31, 2032. Therefore, the court would have approximately five to seven years within which to work with the minor and provide rehabilitative services." After the juvenile court explained the probation officer agreed that L.V. had violated the terms of his probation by committing a burglary in May 2024, just 15 days after he was placed on wardship, and committing the instant offenses in August 2024, the court reviewed L.V.'s juvenile delinquency history and noted it had concerns about Probation Officer O.E.'s opinion L.V. could be rehabilitated prior to the expiration of the juvenile court jurisdiction.

The juvenile court explained as follows: "First, it should be noted that the minor requested termination of formal probation in 2023, as unsuccessful. The minor was not interested in completing probation successfully, despite having approximately 3 more months available to him to complete probation. Further, one year later on March 6, 2024, the minor was charged in another petition. Then, after having been declared ward of the court on May 1, 2024, engaged in yet more delinquent behavior fifteen (15) days later on May 16, 2025, with more egregious conduct than the prior two petitions. [¶] It is apparent from the four petitions that the minor has no regard for living a law-abiding lifestyle. Further, the minor has no regard for rules imposed by the court, and has shown a complete disregard for following terms and conditions imposed by the court, and supervised through probation. [¶] As to this criteria, the court does not believe the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction. The minor has been given multiple opportunities to comply with court orders on prior occasions, and

26

has failed to follow simple terms on each occasion. The minor continues to engage in criminal conduct, with each offense involving more serious conduct and behavior than before. Both the first and last offense involves firearms. The last offense involved the alleged shooting of another human being." Based on L.V.'s prior conduct while on probation, the court did not believe "sufficient time exists to provide" L.V. with "successful rehabilitative services such that [L.V.] would benefit and become law abiding." The court noted that from August 1, 2022 to August 19, 2024, L.V. had shown "no progress at all in becoming law-abiding," but rather, his behavior had become "progressively worse as he [had] repeatedly engaged in criminal conduct and defied court orders and probation attempts to help [L.V.] be successful."

L.V. argues the juvenile court erred in discounting the probation officer's "professional assessment" and substituting its own conclusion without evidentiary support. He claims that he had "made meaningful progress" and had behaved well in juvenile hall.

As an initial matter, we note insofar as the probation officer was testifying as an expert, "the juvenile court was not required to credit the testimony of the [ ] expert [or otherwise weigh evidence regarding the rehabilitation criterion in the way L.V. preferred]. As trier of fact, it was free to discredit such testimony." (*J.S.*, *supra*, 105 Cal.App.5th at p. 212; see *In re Alejandro G.* (2012) 205 Cal.App.4th 472, 480 (*Alejandro G.*) [the fact that the court's finding conflicted with two experts' opinions did not show a lack of substantial evidence because the court is not obligated to adopt the

27

experts' opinions].)  And the court did not abuse its discretion by relying on other evidence in the record, including L.V.'s prior conduct while receiving probationary services.  Furthermore, the court acted well within its discretion to reject the probation officer's positive assessment of this factor, considering the multiple fights L.V. had in juvenile hall and his ongoing and worsening criminal conduct.  We find substantial evidence supports the challenged finding as to the rehabilitation criterion.

### 3. Previous Delinquent History

The third statutory criterion directs the juvenile court to consider the "minor's previous delinquent history" and, when doing so, to "give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior."  (§ 707, subd. (a)(3)(C)(i)-(ii).)  Juvenile courts enjoy "broad discretion to consider all evidence relevant to this inherently case-by-case determination," including all forms of delinquent behavior.  (*D.C.*, *supra*, 71 Cal.App.5th at p. 455; see *id.* at p. 456 [the juvenile court considered the minor's "behavior documented in his school records"]; *J.S.*, *supra*, 105 Cal.App.5th at pp. 214-215 [the juvenile court considered the minor's " 'significant school delinquency' history starting in the seventh grade, including poor behavior, suspensions, and multiple attempts by school officials to rehabilitate [the minor]"].)

In evaluating this criterion, the juvenile court stated:  "[T]he court finds that the minor does have a prior documented, formal delinquent history with the juvenile court.

As discussed above, the minor has had a total of four separate, distinct petitions filed involving a variety of alleged offenses and criminal conduct, ranging from firearms possession, retail theft, residential burglary and attempted murder." Disagreeing with Probation Officer O.E.'s assessment of this criteria, the court further explained: "Even the probation officer states in his written report, that '. . .[t]here is a pattern of possessing firearms that stands out when looking at [L.V.]'s prior delinquent history.' The probation officer goes on to state the minor's high degree of criminal sophistication. Interestingly, probation opines that the minor should remain under juvenile court jurisdiction. The court does not agree with the probation officer's assessment that the minor's compliance with probation was good. Clearly, the minor was unsuccessful on formal probation and allegedly committed delinquent acts while as a ward of the court. This cannot be stated as 'good' compliance. [¶] Based on the prior documented delinquent history, the court would find, as to this criteria that transfer would be appropriate, despite the probation officer's statement to the contrary."

L.V. points to the probation officer's testimony concerning the attempted murder being his first known act of violence and L.V.'s compliant behavior in a structured setting, and suggests the court improperly relied on the number of L.V.'s petitions rather than considering the "seriousness of [his] history in context." Noting he "completed only six months of 725 probation beginning in 2022 and spent only three months under wardship before the August 2024 petition was filed" and that "[t]hese nine months represented the only structured periods in which he received juvenile court intervention,"

he also asserts that the court did not give "proper consideration to the limited nature of this supervision when evaluating his delinquent history." L.V. points to the probation officer's testimony concerning L.V.'s behavior in juvenile hall, no evidence suggesting "prior documented pattern of organized criminal behavior" or criminal sophistication, and "peer and relational dynamics that shaped these events." We are unpersuaded by L.V.'s arguments. As we have explained, in a substantial evidence challenge, an appellant cannot carry his burden on appeal by merely rearguing the evidence and/or reasserting his position at trial. Instead, the appellant must lay out the evidence favorable to the other side and show why it is lacking. L.V.'s failure to do so here is fatal to his claim. (*Defend the Bay*, *supra*, 119 Cal.App.4th at p. 1266.)

In any event, there is ample evidence in the record supporting the juvenile court's determination that the previous delinquent history criterion weighs in favor of transfer. L.V. ignores the evidence in the record showing his extensive delinquent history, which encompasses a person's criminal or antisocial behavior that occurred before they reached the age of majority (i.e., 18 years old). (See *D.C.*, *supra*, 71 Cal.App.5th at pp. 445-446, 450-451, 453, 455-456 [delinquent history may include conduct that occurred after the offense related to the transfer hearing, as well as conduct in school records even if that conduct did not result in a delinquency petition].) In addition to the four wardship petitions, L.V.'s delinquent history includes possession of a handgun and 260 grams of marijuana when L.V. was 14 years old. The handgun had been reported stolen exactly one week earlier. L.V. also stole a gun from his grandfather in November 2022. When

the grandfather contacted L.V.'s mother, she admitted L.V. had taken the firearm. L.V. did not report this incident to his probation officer. Furthermore, while on probation, L.V. had 18 unexcused absences from school, positive drug test results for marijuana, the arrest for stealing his grandfather's gun, and continuing to engage in a gang lifestyle. In March 2023, L.V.'s grant of probation was terminated as "unsuccessful." Then in January 2024, L.V., accompanied by three others, grabbed several cell phones from a T-Mobile store, then fled in a vehicle and was charged with felony organized retail theft. In May 2024, L.V., along with others, stole watches, jewelry, firearms, and other items worth over $150,000. L.V. then boasted about getting away with $10,000, and referred to himself as a "flocker," meaning a burglar on social media. The current shooting incident occurred about three months later on August 17, 2024, while L.V. was still on probation. Moreover, during his detention in juvenile hall, which had begun on August 20, 2024, L.V. had been involved in four physical fights with other minors. In two of those incidents, he had been determined to have been the aggressor, while in another he was determined not the aggressor, and in another, the altercation was deemed mutual combat. In short, substantial evidence supports the juvenile court's findings as to the previous delinquent history criterion.

### 4. Previous Attempts at Rehabilitation

The fourth criterion requires the juvenile court to consider whether the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" weighed in favor of transfer. (§ 707, subd. (a)(3)(D)(i).) When evaluating this criterion, the juvenile court must "give weight to any relevant factor, including, but not limited to, the adequacy of the services previously provided to address the minor's needs." (*Id.*, subd. (a)(3)(D)(ii).)

In assessing this criterion, after noting the current petition was L.V.'s third matter before the juvenile court and L.V.'s chronological history, the court stated: "[T]he minor has shown he cannot be successful on probationary terms. First, he was unsuccessfully terminated from formal probation after three months. The minor did not ask to remain on probation in order to achieve a successful closure after the six month term would have expired. Further, after being declared a ward of the court on May 1, 2024, the minor allegedly committed a residential burglary on May 16, 2024, just 15 days later. Although the petition was not filed on that matter until January 8, 2025, the minor's criminal conduct occurred within days of being granted wardship. Then, on August 17, 2024, 90 days after the residential burglary, the minor allegedly was involved in the attempted murder case. [¶] This minor has no regard for the law, court orders, or probation terms. Clearly, the minor has no regard for any order and has shown a complete disregard for the law and court orders." The court found that "[t]he 'success' of prior rehabilitative efforts has been non-existent" and that L.V. had made "minimal to no effort" to prior services offered. The court thus disagreed with the probation officer's recommendation to allow

32

L.V. to remain under juvenile jurisdiction and found the recommendation to be "without merit or justification." The court believed, as to this specific criteria, "transfer is appropriate."

On appeal, L.V. does *not* specifically argue there was any evidence showing that the previous attempts to rehabilitate him were successful. Instead, he points to Probation Officer O.E.'s testimony that during his wardship, he had attended school and earned passing grades, became sober, made progress in completing community service hours, and attended his court-ordered victim awareness program. He argues there was no evidence he had received trauma-informed counseling, behavioral therapy, or long-term substance abuse treatment and "[t]he court's conclusion that rehabilitation had failed ignored the statutory requirement to consider whether prior services had been sufficient."

Substantial evidence supports the juvenile court's finding that this criterion weighed in favor of transfer to a court of criminal jurisdiction. The record reflects that L.V. engaged in a pattern of delinquent behavior between the ages of 14 and 16, some of which, such as the organized thefts and residential burglary, was gang related. As a consequence of his behavior, L.V. was placed on informal and formal probation, which he failed to complete. As part of his probation, L.V. was prohibited from using controlled substances, possessing firearms, violating the law, and not knowingly having direct or indirect contact with anyone disapproved by parent or probation officer and ordered to complete counseling and community service. Although the record does not include evidence as to the specific services offered to L.V. to address his needs, the record

33

supports the juvenile court's finding that previous attempts at rehabilitation had not been successful. The record discloses that L.V. violated the terms of his probation multiple times, including possessing firearms and continuing to violate the law by committing new offenses.

On this record, the juvenile court could reasonably find that, despite L.V.'s placement on both informal and formal probation, he had no willingness or ability to improve his behavior based on his continued poor conduct, including his failure to disassociate with the Wyld Lyfe street gang and his continued commission of crimes that were escalating in severity, including the attempted murder of M.G. The juvenile court was not required to accept the probation officer's opinion that L.V. was making good progress while in juvenile hall. The juvenile court did not abuse its discretion in disagreeing with the probation officer's opinion and instead relying on the other evidence before it. (See *J.S.*, *supra*, 105 Cal.App.5th at p. 212 [trial court is not bound by an expert's testimony and opinion]; *Alejandro G.*, *supra*, 205 Cal.App.4th at p. 480 [court not obligated to adopt experts' opinions].)

5. Circumstances and Gravity of Alleged Offenses

The fifth and final criterion, the circumstances and gravity of the offense (§ 707, subd. (a)(3)(E)(i)), "focuses on the offense ' "alleged in the petition" ' [citation], and like the other statutory criteria, it is 'based on the premise that the minor did, in fact, commit the offense.' [Citation.] But the allegation that a minor committed a serious offense, including murder, does not 'automatically require a finding of unfitness.' " (*Kevin P.*,

*supra*, 57 Cal.App.5th at p. 189, italics omitted.)  When evaluating this criterion, the juvenile court must give weight to any relevant factor, including evidence that, while not justifying or excusing the crime, tends to lessen its magnitude, including, but not limited to, "the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development."  (§ 707, subd. (a)(3)(E)(ii); *Kevin P.*, *supra*, 57 Cal.App.5th at p. 189.)

In assessing this criterion, the juvenile court stated:  "The probation officer describes the minor's actions as being serious and callous in nature.  It is well documented that the minor initially attempted to fire the gun while it was placed against the victims head, but that a malfunction in the firearm prevented the victim from being shot at close range.  The minor then attempted and succeeded in firing the weapon two more times.  The victim was struck once while attempting to flee.  [¶]  Here, probation recommends a transfer to adult court is appropriate.  The People and the court agree."

L.V. claims that "nothing in the record established that L.V. set out with an intent to inflict lethal harm," and that the court "inferred adult level intent and deliberation from the mere fact that the offense involved a firearm."  He further asserts that the court was "obligated to examine whether [his] conduct reflected impulsivity, panic, immaturity, or susceptibility to outside influence" but failed to address those factors, as well as factors relating to peer and familial relationships or dynamics and his amenability to rehabilitation before and after the alleged offenses.

35

We reject L.V.'s suggestion that the evidence he cites prevented the juvenile court from finding that this criterion weighed in favor of transfer to a court of criminal jurisdiction.  (See *Kevin P.*, *supra*, 57 Cal.App.5th at pp. 189-190 [rejecting similar claim, explaining that the minor failed to "offer any authority for the proposition that expert testimony—or any other evidence beyond that bearing on what happened during the crime—is required to evaluate this criterion"]; *Alejandro G.*, *supra*, 205 Cal.App.4th at p. 480 [court not obligated to adopt experts' opinions].)  The record reflects that the juvenile court considered the relevant factors, and substantial evidence supports the court's determination that the circumstances and gravity of the offenses weighed heavily in favor of transfer to a court of criminal jurisdiction.  (See *C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, 1033-1034 [substantial evidence supported the juvenile's court's findings as to the circumstances and gravity of the offenses criterion because there was evidence that the minor personally and actively participated in an unprovoked gang-related attack, kicked and punched the victim, and stomped on the victim's head and killed him after the other attackers fled].)

6.  Amenability to Treatment as a Juvenile

As noted, ante, a recent amendment to section 707 requires the juvenile court to make an "ultimate" finding that the minor "is not amenable to rehabilitation while under the jurisdiction of the juvenile court."  (§ 707, subd. (a)(3); see *Miguel R.*, *supra*, 100 Cal.App.5th at pp. 164, 167.)  The court must consider all five enumerated factors and

state its reasons for finding the minor to be unamenable to rehabilitation while under the jurisdiction of the juvenile court.  (§ 707, subd. (a)(3).)

At the conclusion of its written transfer order, the court explained:  "After reviewing and considering all reports, evidence and criteria pursuant to WIC 707(a)(3)(A-E), the court has determined that the People have met their burden by clear and convincing evidence to have this court order a transfer to a court of criminal jurisdiction.  The evidence at the hearing does establish that the minor should be transferred.  The actions of the minor were premeditated and show sophistication by the minor.  The court does believe that this minor is not amenable to rehabilitative efforts or services.  The court has reviewed the minor's treatment needs—many of them listed on the probation officer's report page 25—and determines that insufficient time exists to provide these services.  [¶]  Whether the court has until age 23 or 25, there simply is insufficient time to address the numerous needs of this youth.  The minor has engaged in a horrendous act and has shown no remorse for his actions.  The minor has shown an inability to comply with court orders on numerous occasions, as well as a complete sense of apathy toward the completion of any probation services."

In short, because substantial evidence supports the juvenile court's findings as to each of the five statutory criteria, there is no basis to reverse the court's "ultimate" finding that the People satisfied their burden of proof by clear and convincing evidence that L.V. was not amenable to rehabilitation while under the jurisdiction of the juvenile courts.  Accordingly, we will affirm the transfer order.

IV.

DISPOSITION

The juvenile court's order transferring this matter to a court of criminal jurisdiction is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

MILLER
J.

38